NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JERRY RAY INGELS,**

          **Plaintiff,**

**v.**                                         **Case No. 6:16-cv-1581-Orl-37KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by Plaintiff, Jerry Ray Ingels, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy of the record before the Social Security Administration ("SSA"), Doc. Nos. 10, 12, and the parties' Joint Memorandum, Doc. No. 14.[1]

## PROCEDURAL HISTORY.

In 2012, Ingels filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.* He alleged that he became

---

[1] In the Scheduling Order, I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record. Doc. No. 13. Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Revised Scheduling Order. *Id.* at 4.

disabled on December 1, 2011.  R. 185, 202.  The parties agree that Ingels also filed an application under the Supplemental Security Income for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.,* but this application is not in the record before the Court.  Doc. No. 14, at 1 n. 2.

After his applications were denied originally and on reconsideration, Ingels asked for a hearing before an Administrative Law Judge ("ALJ").  R. 140-41.  An ALJ held a hearing on February 6, 2015.  Ingels, accompanied by an attorney, and a vocational expert ("VE") testified at the hearing.  R. 32-88.

After considering the hearing testimony and the evidence in the record, the ALJ issued a decision.  R. 15-26.  The ALJ found that Ingels was insured under OASDI through September 30, 2018.  The ALJ noted that Ingels was self-employed hauling hay after the alleged disability onset date, but he found that Ingels' earnings in this work were "not quite substantial gainful activity earnings."  R. 17.  Therefore, the ALJ concluded that Ingels had not engaged in substantial gainful activity since the alleged disability onset date.  *Id.*

The ALJ found that Ingels had degenerative disc disease of the cervical spine status post remote fusion and insulin dependent diabetes mellitus, which were severe impairments.  *Id.*  The ALJ determined that Ingels did not have a severe mental impairment.  R. 18.  The ALJ concluded that Ingels did not have an impairment or combination of impairments that met or equaled an impairment listed in SSA regulations.  *Id.*

The ALJ concluded that Ingels had the residual functional capacity ("RFC") to perform light work, "except he can only occasionally balance, stoop, kneel, crouch, crawl and climb ramps/stairs. He should never climb ladders, ropes, or scaffolding.  He should avoid concentrated exposure to

temperature extremes (hot/cold), wetness, humidity, vibration and hazards, including dangerous machinery and unprotected heights." R. 19. In reaching this conclusion, the ALJ gave little weight to the opinions of Mark Sacher, D.O., and Mark Kucker, D.O., both of whom were treating physicians. R. 23. The ALJ gave significant weight to the opinions of Donna S. Lester, M.D., an examining physician, and Jesse Palmer, M.D., a reviewing physician. *Id.*

The ALJ determined that Ingels could perform his past work as a telephone solicitor. R. 24. Alternatively, based on the testimony of the VE, the ALJ concluded that Ingels could perform light, unskilled work available in the national economy, specifically Housekeeper, Cleaner; Marker; and, Checker I, all of which were available in the national economy. R. 25. Therefore, the ALJ concluded that Ingels was not disabled. *Id.*

Ingels requested review of the ALJ's decision by the Appeals Council, and he submitted additional medical records. R. 5, 8. On August 5, 2016, the Appeals Council found no reason to review the ALJ's decision. R. 1.

Ingels now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Ingels having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3). A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are generally adequately stated in the Joint Memorandum, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts pertinent to the issues raised to protect Ingels' privacy to the extent possible.

Ingels was born in 1968. R. 36. On the date of the ALJ's hearing, Ingels lived with his four children at his mother's house. R. 37. From August to November 2006, Ingels worked in sales for a time share company. R. 52-54. He also worked as a semi-truck driver, but he no longer had his CDL due to uncontrolled diabetes. R. 38-39. After the alleged disability onset date, he was self-employed hauling hay in a truck and selling it. The truck came loaded with hay, and Ingels' son unloaded it. R. 39-41.

Ingels was injured and had surgery on his neck in 2008. Thereafter, he had pain radiating from his neck to his left shoulder. R. 42-43. He also injured his back. R. 89. He stopped working in 2011 when the pain was too severe to continue. R. 44-45. During the ALJ's hearing, Ingels testified that he could not move his left arm and his hand was numb with tingling. R. 43. He also could not lift his left arm over his head. R. 79. He experienced back pain when sitting. R. 57. He had fallen 2 or 3 times, so he had been prescribed a cane. R. 58.

Ingels testified that he experienced pain instantly when sitting. He estimated that he could sit 15 to 20 minutes before needing to stand, and another 10 to 15 minutes before needing to lie down. R. 58. He could stand for about 15 minutes. R. 43. He had pain when he turned his neck left, up or down. He could lift a gallon of milk with his right arm but not with his left arm. R. 54-55. Due to back pain, he could not bend to touch his knees. R. 57.[2]

---

[2] In a written report dated June 10, 2012, Ingels wrote that, with medication, he could stand or sit for 1 to 2 hours after

Ingels testified that he had been treated with narcotic pain medication, including morphine, oxycodone and Dilaudid. R. 45. He also took Metformin and Novolin for his diabetes. R. 46, 67.

During a typical day, Ingels would help his children get ready for school, and he drove them 10 minutes to their school. He also picked the children up from school. In the afternoon, he helped the children with their homework. During the day, he would lie down for a couple of hours. R. 61-62. He helped the family clean the house on Sundays. He helped with laundry but he could not grab the laundry basket. R. 63. He spent approximately 10 minutes a day on the computer, and he watched little television. R. 64. From time to time, he went to the park with his children and went fishing with them. R. 66.

Medical records confirm that Ingels was injured in 2008. The diagnoses were cervical disc disease, neck pain, left cervical radiculopathy and left shoulder arthritis/tendinitis. R. 426-27, 429. An MRI taken at the time showed a disc protrusion at C5-6 impinging the nerve root, a disc protrusion at C6-7 impinging the spinal cord, a small disc protrusion at C3-4 touching the spinal cord and degenerative changes. R. 432. An MRI of the left shoulder revealed acromioclavicular ("A/C") degenerative joint disease with mild impingement but no rotator cuff tear. R. 433.

William Kuhn, M.D., preformed a cervical discectomy with artificial disc placement at C5-6 on August 18, 2008. R. 443-45. On November 26, 2008, Ingels reported occasional stiffness in his neck and aching in his left shoulder and arm. He had returned to work. R. 440. On February 26, 2009, Ingels reported significant pain in his left neck and shoulder radiating into his arm. R. 438.

---

which he needed to lie down or recline for 1 to 2 hours. R. 361; *see also* R. 373, 375.

NOT FOR PUBLICATION

An MRI of the cervical spine taken on September 7, 2011 revealed that an artifact from prior surgery completely obscured the C5 and C6 levels and the spinal canal. Disc degeneration was observed at the upper cervical level. There was also a disc bulge at C3-4 with no impingement noted. R. 520-21.

Ingels was treated by Dr. Sacher and others at Active Pain Injury from September 2011 through at least October 2013. R. 480-516. Dr. Sacher's handwritten treatment notes are substantially illegible.[3] *Accord* R. 450 (Dr. Lester also found these handwritten treatment records to be "extremely illegible"). At the initial visit, Ingels reported feeling extreme pain in his neck radiating into his left shoulder and arm with recurrent tingling and numbness in the left hand. The treatment provider documented cervical and lumbar spasms with decreased range of motion in the cervical spine. The treatment record has a handwritten note that "patient has financial hardship to see neurosurgeon at this stage." R. 512-13. Subsequent treatment notes continue to reflect spasm in the cervical and lumbar spine with decreased range of motion in the cervical spine. Ingels was treated with oxycodone, Percocet and Flexeril, among other medication. R. 514-16. On February 12, 2012, the diagnoses included lumbago and degenerative disc disease ("DDD") in the cervical spine with left arm numbness. R. 510. On June 6, 2012, the treatment note noted left leg and arm numbness. R. 506. On October 17, 2012, Dr. Sacher wrote a letter stating that Ingels was "unable to do any physical work at this time." R. 593.

---

[3] The ALJ summarized these treatment records as follows: "The claimant treated with Drs. Sacher and Sokoloff from 2012 to 2013 for pain. A cane was prescribed in July 2013. These records note improvement in pain with medication, though the claimant has been on long-term narcotic treatment. (Exhibit 7F)." R. 21. This brief summary supports the conclusion that the ALJ also found these records to be largely illegible.

On September 8, 2012, Dr. Lester examined Ingels at the request of the state office of disability determinations. Ingels reported having neck pain since his surgery. He also had low back pain. R. 450. He estimated that he could stand for 1 hour at a time up to 3 hours total in an 8-hour period. He could walk on level ground for 1 block and sit for up to 1 hour. He could drive in a car for 1 hour. He could lift a gallon of liquid. He was able to do household chores such as cooking, dishes, mopping and sweeping. He was limited in going up and down stairs. He used an electronic cart when shopping. He was taking morphine, hydromorphone, Flexeril, and Neurontin, among other medications. R. 451. Dr. Lester noted that Ingels' speech was very slurred most likely due to heavy use of narcotic pain medication. R. 453. Dr. Lester noted that Ingels walked without an assistive device. R. 452. Upon examination, Dr. Lester observed tenderness throughout the paraspinal area, particularly in the lower lumbar to sacral area on the left. Ingels had normal grip strength in his upper extremities. The range of motion in his shoulder was normal. He was able to squat 50% of the way. He had a significant decrease in range of motion in the cervical spine. Dr. Lester opined that this decrease in range of motion would preclude Ingels from doing any activities that required looking overhead or climbing ladders. It would also make it difficult for him to drive. Because of his medication, Ingels should not use machinery or drive. R. 453.

Dr. Palmer prepared a functional capacity assessment on January 28, 2013 after review of Ingels' records. He opined that Ingels could lift/carry up to 20 pounds occasionally and 10 pounds frequently He could stand and/or walk and sit about 6 hours in an 8-hour workday. He could occasionally climb ramps/stairs, stoop, kneel, crouch, crawl and frequently balance. He could

7

never climb ladders/ropes/scaffolds. He should avoid concentrated exposure to wetness, humidity and vibration. R. 118-21.

On January 29, 2013, Ingels sought treatment from Indravada P. Shah, M.D., for generalized weakness and numbness in both arms. Upon examination, Dr. Shah observed normal range of motion, muscle strength and tone in the back/spine and Ingels gait and station were unremarkable. Dr. Shah adjusted Ingels' medication. R. 478.

On March 20, 2013, Dr. Sacher's treatment record reflects increased pain with tenderness observed in the thoracic spine and other locations that are illegible. R. 496. On April 17, 2013, Dr. Sacher prepared a medical verification form[4] in which he opined that Ingels had lumbar spondylosis, DDD cervical spine and some upper and lower extremity impairment (which is not completely legible). He opined that Ingels could work 1 to 10 hours sitting down or standing up if frequent breaks were permitted. This was a permanent condition. R. 494.

On April 12, 2013, Ingels sought emergency room treatment after a fall. He reported neck and back pain. Upon examination, he had full range of motion in his neck. The impression was acute exacerbation of chronic lumbago and cervicalgia. R. 458-60.

On July 16, 2013, a treatment note reflects tenderness in the thoracic and lumbar spine. R. 490. A cane was prescribed. R. 491. On September 10, 2013, Ingels reported back pain at a level of 7 on a 10 point pain scale. He also indicated that he experienced pain with any movement

---

[4] This form, AWI-WTP 2288(a), is used in Florida by an individual seeking temporary cash assistance under the Welfare Transition Program. *See, e.g.,* Workforce Services, *Welfare Transition Program*, found online at http://sitefinity.floridajobs.org/docs/default-source/office-of-workforce-services/welfare_transition_fact_ sheet.pdf?sfvrsn=2 (last visited January 26, 2018); Medical Verification Form, found online at http:// www.floridajobs.org/pdg/wt/forms/rtf/WT_2288aMedVerific010207_010607 rtf (last visited January 26, 2018).

of his neck. Medication was adjusted including discontinuing Dilaudid and adding morphine. R. 486. On October 8, 2013, morphine was discontinued and Percocet was prescribed. R. 483.

Dr. Kucker treated Ingels beginning in October 2013. R. 558-59. Ingels complained of neck, shoulder and mid-back pain. He was also a newly diagnosed diabetic. R. 534. Dr. Kucker observed that Ingels walked with a cane. He noted on examination that Ingels had severely decreased range of motion with pain in his neck and decreased sensation in his feet. His diagnoses included diabetes mellitus, degeneration of intervertebral discs, degenerative joint disease, osteoarthosis and osteoarthritis. R. 533-35. On November 14, 2013, Dr. Kucker prepared an application for a disabled parking permit for Ingels in which he checked a box indicating a "Severe limitation in a person's ability to walk due to an arthritic, neurological, or orthopedic condition." R. 524. Dr. Kucker's findings of decreased range of motion with pain in the neck and decreased sensation in the feet continued in subsequent treatment records. *See, e.g.,* R. 529-30, 559. The records also reflect that Ingels' diabetes was not well controlled. R. 526. Dr. Kucker completed a medical verification form on December 4, 2013. He opined that Ingels could not work sitting down or standing. Other restrictions on work were that Ingels was diabetic – insulin dependent. Dr. Kucker opined that Ingels could not work at all. R. 523.

On January 24, 2015, Ingels was treated in an emergency department for left-sided neck pain radiating down his left arm with paresthesias in the fingers and left hand with increased left arm weakness. R. 601. After examination, the treatment provider wrote that Ingels had slight weakness in the left arm and tenderness was noted in the cervical spine. R. 603-04. A CT of the cervical spine on January 24, 2015, revealed likely paracentral/lateral disc protrusion or extrusion at C6-7 with resulting foraminal and central canal narrowing. R. 612-13. A follow-up MRI of

the cervical spine could not assess C6-7 due to an artifact that obscured the disc interspaces. R. 614.

Dr. Kucker continued to treat Ingels through 2015. R. 586-91, 620-23. On January 26, 2015, Dr. Kucker observed that Ingels' left upper extremity was hanging and that, on passive movement, Ingels experienced extreme tenderness at about 25 degrees. He was treating Ingels with Dilaudid. He referred Ingels to a neurosurgeon due to his severe neck and arm pain. R. 589. On February 14, 2015, Dr. Kucker wrote that Ingels could not stand or sit for longer than 20 minutes at a time. He could hold things in his hands or arms for about 10 minutes. He opined that Ingels was not able to work. R. 617.

At the ALJ's hearing, the VE testified that Ingels' past work selling time shares was the job of telephone solicitor, which is a sedentary job. His truck driving job was classified as a tractor-trailer truck driver, which required a medium level of exertion. R. 78.

The ALJ asked the VE to assume a hypothetical person who had the RFC the ALJ determined applied to Ingels. The VE testified that this hypothetical person could perform the telephone solicitor job. R. 78. The VE testified that this hypothetical person could also perform jobs available in the national economy, including Cleaner, housekeeping; Marker; and Checker I. R. 79.[5] With a further limitation to not lifting overhead with the left upper extremity and not being able to operate a motor vehicle due to difficulty turning his head, the VE testified that the hypothetical person could still perform the jobs the VE identified. R. 80-81. The VE testified

---

5 Although this page of the transcript refers to the job as "injector," the *Dictionary of Occupational Titles*, 222.687-010, refers to the job as Checker I. DICOT 222.687-010, 1991 WL 672130.

10

NOT FOR PUBLICATION

that if the hypothetical person had to use a cane, it would eliminate all of the light exertional jobs. R. 84. Additionally, the hypothetical person could not perform the jobs of Cleaner, Marker and Checker if he required a sit/stand option alternating every 15 minutes. R. 86-87.

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, Ingels asserts three assignments of error. He contends that the ALJ erred by giving little weight to the opinions of Dr. Sacher and Dr. Kucker, both of whom were treating physicians. He asserts that the ALJ erred by failing to include all of the functional limitations identified by Dr. Lester in the RFC and hypothetical questions to the VE. Counsel for Ingels asks that the final decision of the Commissioner be reversed and that the case be remanded for further proceedings. These are the only issues I will address.

*Weight Given to the Opinions of Dr. Sacher.*

Dr. Sacher treated Ingels over a number of years and, therefore, he is a treating physician. The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id.* at 1240-41. The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ gave little weight to Dr. Sacher's April 2013 opinion that Ingels could work 1 to 10 hours sitting down or standing up if frequent breaks were permitted. The reasons he cited were that (1) Ingels returned to work in 2012 and 2013 at nearly substantial gainful activity levels; (2)

11

the opinion was not supported by the majority of the objective evidence revealing essentially normal physical examination findings; and (3) Dr. Sacher contradicted his October 2012 opinion that Ingels could not work by opining that Ingels could work 1 to 10 hours. R. 23. Substantial evidence does not support these findings.

First, in 2012 and 2013, Ingels was self-employed driving a truck hauling hay, which he sold. SSR 83-34 states that "[s]elf-employment income alone is not a reliable factor in determining SGA, since it is influenced not only by the individual's services but also by such things as market conditions, capital investments, the services of other people, and agreements on distribution of profits." SSR 83-34, 1983 WL 31256. Ingels' 2012 and 2013 tax returns, which are in the record, classify the money he earned in this self-employment as "Gross receipts or sales," R. 291, which provides no information about the hours Ingels worked per day or the tasks he actually performed. Therefore, Ingels' earnings after the alleged disability onset date do not support a finding that Ingels was engaged in self-employment work at nearly substantial gainful activity levels.

Second, because Dr. Sacher's medical records are largely illegible, the ALJ could not have determined what the "majority" of the medical records showed without being able to read all of the records from Active Pain Injury, where Ingels was treated for two years. The illegibility of important evidentiary material can warrant a remand for clarification and supplementation to determine whether the ALJ fully understood the medical evidence in the record. *Yamin v. Comm'r of Soc. Sec.*, No. 6:07-cv-1574-Orl-GJK, 2009 WL 799457, at * 12-13 (M.D. Fla. March 24, 2009).

Finally, Dr. Sacher's October 2012 opinion that Ingels could not perform any physical work may be consistent with Ingels' testimony that he merely drove a truck hauling hay but that he did not perform any physical exertional work because his son unloaded the hay. In any event, a

physician is allowed to change his opinion as his patient's condition changes overtime. Therefore, even if Dr. Sacher's October 2012 opinion is different from his April 2013 opinion, the differences do not necessarily constitute a contradiction rather than a change in Dr. Sacher's opinion about Ingel's functional capacity.

Because substantial evidence does not support the reasons the ALJ articulated for giving little weight to Dr. Sacher's opinion, the first assignment of error is meritorious.

*Weight Given to the Opinion of Dr. Kucker*.

Because Dr. Kucker treated Ingels from 2013 through 2015, he was also a treating physician whose opinions were entitled to considerable weight absent a showing of good cause to afford them lesser weight. The ALJ gave little weight to Dr. Kucker's opinion in the February 2015 medical verification form that Ingels could not stand or sit for greater than 20 minutes and could not hold things for more than a short period of time. The ALJ stated three reasons to support this portion of his decision: (1) the opinion was inconsistent with Dr. Kucker's treatment notes which noted no significant abnormal physical findings; (2) the opinion was inconsistent with Ingels' reports that he could sit for at least 1 hour, drive for 1 hour and perform other household chores; and, (3) the opinion that Ingels could not work due to diabetes was "ridiculously conclusory." R. 23. Substantial evidence does not entirely support each of these findings.

First, Dr. Kucker's treatment notes document decreased range of motion in Ingels' neck accompanied by pain and decreased sensation in his feet. In January 2015, Dr. Kucker's treatment notes reflect that Ingels' left arm was hanging and, upon examination, Dr. Kucker observed extreme tenderness on passive movement above 25 degrees in all planes. Additionally, Dr. Kucker's

13

treatment notes reflect that Ingels' blood sugar was not well controlled.[6] These are all abnormal physical findings.

Second, the ALJ is correct that Ingels told Dr. Lester in 2012 that he could stand for 1 hour at a time, drive a car for 1 hour and perform some household chores. Curiously, the ALJ credited this testimony but found that Ingels' testimony at the ALJ's hearing that he could sit 15 to 20 minutes before needing to stand was not credible. The ALJ did not explain why he believed some of Ingels' reports of functional limitations but not others.

Third, counsel for the Commissioner concedes that the ALJ misread the medical verification form as stating that Dr. Kucker believed that Ingels could not work due to diabetes. Doc. No. 14, at 29-30. Rather, in the form, Dr. Kucker stated that insulin-dependent diabetes was an "other restriction of work," not that it was sole basis for the determination that Ingels could not work. Therefore, the third reason given by the ALJ for giving little weight to Dr. Kucker's opinion is incorrect.

Because substantial evidence does not support the reasons the ALJ articulated for giving little weight to Dr. Kucker's opinion, the second assignment of error is well taken.

*Opinion of Dr. Lester.*

The ALJ gave significant weight to the opinion of Dr. Lester, who examined Ingels on one occasion. The ALJ did not, however, include in the RFC or in hypothetical questions to the VE Dr. Lester's opinion that Ingels could not perform activities that required him to look overhead.

---

[6] The ALJ also did not discuss the application for a disabled parking permit, in which Dr. Kucker checked a box indicating that Ingels had a severe limitation in the ability to walk due to an arthritic, neurological, or orthopedic condition.

14

NOT FOR PUBLICATION

Counsel for the Commissioner argues that the ALJ implicitly rejected this limitation. They base this contention on Dr. Palmer's opinion, which does not include a limitation on looking overhead. However, because the ALJ gave significant weight to both Dr. Lester and Dr. Palmer's opinions, there is an insufficient basis to support the implicit rejection arguments.

Counsel for the Commissioner argues, alternatively, that the descriptions in *Dictionary of Occupational Titles* of the jobs the ALJ identified at step five of the sequential evaluation do not require looking overhead. However, the Eleventh Circuit has stated: "If an action is to be upheld, it must be upheld on the same bases articulated in the agency's order . . . without relying on a *post hoc* rationalization." *Baker v. Comm'r of Soc. Sec.*, 384 F. App'x 893, 896 (11th Cir. 2010)(unpublished opinion cited as persuasive authority). Therefore, counsels' after-the-fact attempt to provide rationale that the ALJ did not articulate in his decision cannot be a basis to uphold the decision.

For these reasons, the third assignment of error is also meritorious.

Because the ALJ erred, his decision, which is the final decision of the Commissioner, is due to be reversed. The matter should be remanded to the Commissioner for further proceedings.

## RECOMMENDATION.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the final decision of the Commissioner be **REVERSED** and that the matter be **REMANDED** for further proceedings.

NOT FOR PUBLICATION

I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

**Notice.**

**Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual and legal conclusions.**

**Respectfully Recommended** this 30th day of January 2018.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE
